# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# DOCKET NO. 3:07CR282-R

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION AND ORDER** |
| JAMES SINGLETON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Defendant's "Motion To Suppress Tangible Evidence And Statements" and "Memorandum Of Law In Support . . ." filed March 31, 2008 (filed together as document #21). The "Government's Response In Opposition . . ." (document #23) was filed April 16, 2008, and the undersigned conducted an evidentiary hearing on May 13, 2008. Therefore the subject motion is currently ripe for disposition.

## I. FACTUAL BACKGROUND AND FINDINGS

At the time the Defendant's Motion to Suppress was filed, as the caption indicates, he sought suppression of both tangible evidence seized *and* statements made during and following his detention and arrest on July 10, 2007. The Government has since agreed, not to use the Defendant's statements in its case in chief, reserving its right to offer evidence of the statements, if at all, to impeach the Defendant if he testifies. For his part the Defendant reserves the right to challenge the statements at that time as having been involuntarily given and therefore as not admissible even for impeachment purposes.

The events relevant to the subject motion occurred during mid-afternoon on July 10, 2007 at the Star Motel, located at 5911 North Tryon Street in Charlotte. On that date Charlotte-

Mecklenburg Police Officers Kirk Bynoe, Charles Gunter, and Scott Costa were on routine patrol in a marked police car when they noticed the Defendant in the Star Motel parking lot carrying a clearly visible holstered handgun. It is not against North Carolina or federal law to carry a non-concealed handgun unless the one possessing the weapon is otherwise prohibited from doing so, for example, where the one possessing the firearm is a convicted felon, an illegal alien, or one who has been adjudicated to be mentally incompetent.

The Government contends, and put on supportive evidence at the May 13, 2008 hearing to show, however, that the Star Motel and the nearby "Hidden Valley" neighborhood are "high crime areas." For example, Officer Bynoe testified at the hearing that he has worked in this area (known as the "North Tryon Division") for most of his five years with the Charlotte-Mecklenburg Police Department, has served as "Community Coordinator" for the North Tryon Division during part of that period, and that the "frequent crime" at Star Motel includes prostitution, drug offenses, robberies, theft of vehicles, and shootings. An equally serious litany of frequent criminal offenses was recited as occurring in the nearby Hidden Valley neighborhood. Both are considered by local law enforcement to be problem areas or "hot spots" as they are called within the Police Department.

In its Response in Opposition the Government summarized the Police Department's basis for designating the Star Motel and its environs a "hot spot" thus:

> In 2007 alone, within just the 500 feet surrounding the motel, there were 152 calls for an officer to respond, 130 criminal offenses committed, and 110 arrests made. Of those offenses committed, approximately 35 were violent in nature and 10 were drug related. Within that same 500 feet in 2006, there were 104 criminal offenses committed. In 2005, there were 99 offenses. Additionally, because of the rampant violence and gun crime in the area, it has been designated a Project Safe Neighborhood[].

"Government's Response In Opposition . . ." at 2. The two Officers who testified both stated that the "high crime" character of this area in general and the Star Motel in particular was a significant

factor in how they responded to observing the Defendant carrying a firearm on July 10, 2007.

Officer Bynoe testified that he turned the vehicle around and drove the marked vehicle into the parking lot, exited the vehicle with his gun drawn, and made eye contact with the Defendant. Officer Bynoe described the look the Defendant gave him as "afraid" and "nervous," and surmised that the Defendant might be thinking, "Should I run?" In any event, Officers Bynoe and Gunter both testified that at that point the Defendant made a 180 degree turn and began walking away.

Both Officers also testified, credibly in the view of the undersigned in spite of not having included it in either of their reports, that the Defendant failed to stop upon Officer Gunter's first command. However, it is undisputed that the Defendant did stop shortly thereafter (according to Government testimony, after a louder and more aggressive order to stop was given by Officer Gunter), and that the Defendant did not otherwise resist their investigation on his ultimate arrest.

Both Officers testified that Officer Bynoe secured and handcuffed the Defendant and Officer Gunter removed the handgun from his holster. Within five to ten minutes of the initial encounter it was discovered that the Defendant had a prior felony conviction, which discovery led to his arrest and the current charges.

Officer Bynoe testified that those who lawfully carry firearms in this area in a visible manner are typically "security officers" of one kind or another. Thus, the fact that the Defendant was dressed casually in shorts and a tank top, and had on no clothing or identification indicating that he was a security officer,[1] increased their suspicion.

On cross-examination Officer Bynoe conceded that he made no mention in his police report of making eye contact with the Defendant, the "afraid" or "nervous" look, the 180 degree

---

[1] At the conclusion of the hearing, the Government conceded that the Defendant did have a position as a "security officer" at a different location, although he was not on duty at the time of his detention and arrest.

turn/walking away, or that the Defendant had failed to follow Officer Gunter's initial command to stop. Officer Bynoe also conceded that it is not illegal for most individuals to openly carry a firearm in North Carolina and that the Defendant had advised him that he had applied for and obtained a permit to purchase the firearm in question.

Officer Gunter essentially corroborated Officer Bynoe's testimony. Specifically, he testified that he had served in the North Tryon Division for most of his 12 1/2 year career, and that he had also served as a "Community Coordinator" during that period. With that background Officer Gunter likewise testified that the Star Motel was in – and was itself – a "high crime area"; that he saw the Defendant in the parking lot visibly carrying a gun on July 10, 2007; that he, too, perceived a nervous look on the Defendant's face[2] before he made a 180 degree turn and walked away "at a high rate of speed"; and that the Defendant only complied after he ordered him to stop a second time.

On cross-examination Officer Gunter conceded that he did not mention the Defendant making a 180 degree turn and walking away in his report either, and testified that the marked car's video recorder had not been activated due to how quickly the observation of the Defendant and the ensuing investigation had unfolded.

While he was either in detention or under arrest the Defendant allegedly consented to a search of his person. Although the Defendant correctly notes that consent to search following an unlawful detention or arrest is likely to be found invalid, he does not otherwise contest its free or voluntary nature. In any event, whether valid or not, search of the Defendant's person resulted in the discovery, <u>inter alia</u>, of a New York Department of Corrections identification card.

Finally, subsequent investigation – which the Defendant argues is "fruit of the poisonous

---

[2]Officer Gunter described the look on the Defendant's face when he saw the approaching police officers as an "Oh shit!" or "fight or flight" look.

tree" – led to discovery of ammunition and several holsters in the room in which the Defendant and his girlfriend were staying at Star Motel, and two additional firearms in other locations.

## II. CONCLUSIONS OF LAW

An officer may stop and briefly detain a person for investigative purposes (known as an investigative or Terry stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. United States v. Arvizu, 544 U.S. 266 (2002) (reaffirming "totality of the circumstances" test); United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989).

The legitimacy of an investigative stop thus turns on what constitutes "reasonable suspicion," which the Fourth Circuit has called "a common-sensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). Accord Arvizu, 544 U.S. at 273 (permitting "officers to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (internal quotation omitted).

Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. See, e.g., United States v. McCoy, 513 F.3d 405, 412-13 (4th Cir. 2008) (experienced officer's observation of vehicles park briefly in store parking lot where drug sales had previously occurred, then move to another nearby lot where drug sales had also occurred and where occupant of one vehicle got into the other vehicle for a short time, after which that vehicle left at a high rate of speed as officer approached, sufficient to constitute reasonable suspicion); United States v. Harris, 39 F.3d 1262, 1268-69 (4th Cir. 1994) (officer's observation of man leaving apartment in

a vehicle after confidential informant advised drug delivery was imminent constitutes reasonable suspicion to stop vehicle); United States v. Turner, 933 F.2d 240, 242-44 (4th Cir. 1991) (officer with experience in narcotics investigations had reasonable suspicion to stop and determine whether subject was "cooking" illegal drugs after observing her carry cup of water out of convenience store, walk to car, and lean over front seat as if to hide something); and United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987) (officer's nighttime observation of man walking away from otherwise deserted area where burglar alarm had just gone off constitutes reasonable suspicion to stop man).

Many factors have been approved as properly contributing to "reasonable suspicion." Among them: (1) presence in a high crime area, United States v. Perkins, 363 F.3d 317, 320-21 (4th Cir. 2004); United States v. Christmas, 222 F.3d 141 (4th Cir. 2000), cert. denied, 531 U.S. 1098 (2001); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); Moore, 817 F.2d at 1107; and (2) evasive conduct, United States v. Smith, 396 F.3d 579, 585-87 (4th Cir.), cert. denied, 545 U.S. 1122 (2005); United States v. Humphries, 372 F.3d 653, 657-60 (4th Cir. 2004); United States v. Tate, 648 F.2d 939, 943 (4th Cir. 1981) (attempt by subjects to hide their faces).

Applying these well established principles of law to the facts in this case it is clear that the Officers had "reasonable suspicion" for the ten minutes or so of the Terry stop (before they had probable cause to arrest the Defendant as a felon in possession of a firearm). Specifically, there is credible evidence that the Defendant was observed in a high crime area visibly carrying a firearm; he appeared nervous and afraid to the officers approaching him; he turned and began to walk away from the officers; and he required two orders before complying with Officer Gunter's directive to stop. Given the low threshold for "reasonable suspicion," the well-established law requiring courts to credit "the practical experience of officers who observe on a daily basis what transpires on the street," Lender, 985 F.2d at 154, and the fact that the officers were able to determine that the Defendant was a convicted felon in ten minutes or less, there is no basis for suppressing the tangible evidence seized in this case.

### III. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that the Defendant's "Motion to Suppress Tangible Evidence . . ." (document #21) be **DENIED**.

### IV. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

### V. ORDER

The Clerk is directed to send copies of this Memorandum And Recommendation And Order to counsel for the parties; and to the Honorable Martin K. Reidinger.

**SO ORDERED AND RECOMMENDED.**

Signed: May 14, 2008

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge